J-S05022-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KEVIN DOUGLAS MCGEE, | |
| Appellant | No. 73 MDA 2015 |

Appeal from the Judgment of Sentence November 24, 2014
In the Court of Common Pleas of Berks County
Criminal Division at No(s): CP-06-CR-0003738-2013

BEFORE: BENDER, P.J.E., SHOGAN, and PLATT,[*] JJ.

MEMORANDUM BY SHOGAN, J.: **FILED JANUARY 29, 2016**

Kevin Douglas McGee ("Appellant") appeals from the judgment of sentence imposed on November 24, 2014, after a jury found him guilty of multiple drug and firearm offenses. We affirm.

The case arises out of a shooting incident in Reading, Pennsylvania, at 2:40 a.m. on February 21, 2013. In response to a report of shots fired, Reading Police Officer Christopher Dinger proceeded to the Queen City Diner. There, witnesses told the officer about a black man with dreadlocks in a grey hoodie who ran into the diner claiming he had been shot, then left the diner and drove off in a black SUV. Officer Dinger was then dispatched to Reading Hospital where a man fitting the victim's description was being

---

[*] Retired Senior Judge assigned to the Superior Court.

treated for gunshot wounds. Officer Dinger identified the victim as Appellant, who informed the officer that he had been shot near Topher's bar in Reading, and that his address was 536 Fern Avenue, Reading, Pennsylvania. Officer Dinger and several other officers proceeded to 536 Fern Avenue. While checking the area around the house, Officer Dinger observed a white Lincoln Navigator parked in an alley behind the residence and a black Cadillac Escalade parked inside an open garage. The officer observed what he believed to be blood on the console of the Navigator. He also observed a flat tire on the Escalade and bullet holes in the front driver's side panels. Inside the Escalade, Officer Dinger saw a black book bag on the floor of the passenger side front seat. Both vehicles were towed to a local garage while the police applied for a search warrant.

Inside 536 Fern Avenue, Reading Police Officer Kyle Kunkle encountered co-defendants Vanessa Moore and Erica Henderson, Ms. Henderson's two young daughters, and Veronica Ortega. He also found a loaded .380 Bersa handgun on the living room sofa that was registered to Ms. Moore. Ms. Moore told Officer Kunkle that Appellant used the residence for mail but he had not lived there for a long time. On the first floor, the police found mail addressed to Appellant at 536 Fern Avenue, and Criminal Investigator Michael Perkins found a Bersa gun box in the kitchen pantry. In the basement, the police found, *inter alia*, various types of ammunition in a refrigerator, a safe containing drugs and pills, and a plastic tote marked

"Kev's sneakers." Detective Perkins found Appellant's 2012 Pennsylvania identification card with an address of 536 Fern Avenue in a man's wallet. Criminal Investigator Joseph Snell searched the second floor front bedroom, where he found a photograph of Appellant on a nightstand, men's socks and ammunition in the nightstand drawer, men's clothing, men's body wash in the shower, and a loaded Winchester twelve gauge shotgun and handcuffs in a silver gun case under the bed.

Investigator Snell assisted in executing the search warrant for the Escalade, which revealed documents addressed to Appellant at 536 Fern Avenue. Additionally, Investigator Snell recovered a black book bag, which he admittedly opened, observing inside what he believed to be drugs and drug paraphernalia. He returned the bag to the vehicle until an additional search warrant could be secured. With a second search warrant, Criminal Investigator Kevin Haser recovered the black book bag, which contained multiple baggies of crack cocaine and powder cocaine, four handguns, a scale, spoons, plates, razor blades, "Black Molly" pills, empty blue and green baggies, and ammunition.

The Navigator was registered to Ms. Moore, and the Escalade was registered to Ms. Moore's mother, Rosalie Moore. None of the guns was registered to Appellant, and fingerprints recovered from the black bag and its contents belonged to Ms. Henderson. Appellant was ineligible to possess a firearm due to a prior felony conviction.

Following his jury trial and conviction, the trial court sentenced Appellant to incarceration for an aggregate term of ten to twenty years, followed by ten years of probation. Defense counsel withdrew with the trial court's permission, and appellate counsel was appointed. This appeal followed. Appellant and the trial court have complied with Pa.R.A.P. 1925.

On appeal, Appellant presents the following questions for our review:

1. Whether the trial court erred in excusing *sua sponte* Juror #1 prior to deliberations over the objection of counsel and without good cause?

2. Whether there was insufficient evidence to support the jury's verdict as the Commonwealth failed to establish Appellant's intent to exercise control over the drugs and guns found inside the black book bag located inside the black Cadillac Escalade?

3. Whether the[re] was insufficient evidence to support the jury's verdict as the Commonwealth failed to establish Appellant's knowledge that he was aware there were drugs and guns inside the black book bag located inside the black Cadillac Escalade?

4. Whether there was insufficient evidence to support the jury's verdict as to the gun charges pertaining to firearms located inside 536 Fern Avenue as the Commonwealth failed to establish Appellant's intent to exercise control over the firearms?

5. Whether there was insufficient evidence to support the jury's verdict as to the gun charges pertaining to firearms located inside 536 Fern Avenue as the Commonwealth failed to establish Appellant's knowledge that firearms were located inside the residence?

Appellant's Brief at 4.

Appellant first challenges the trial court's decision to remove Juror Number One and replace her with an alternate juror. Appellant's Brief at 9. "Pursuant to Pa.R.Crim.P. [645(a)], a trial court may seat an alternate juror whenever a principal juror becomes unable or disqualified to perform his duties." *Commonwealth v. Williams*, 720 A.2d 679, 684 (Pa. 1998). "This discretion exists even after the jury has been impaneled and the juror sworn." *Commonwealth v. Carter*, 643 A.2d 61, 70 (Pa. 1994) (citation omitted). The trial court's discretion in this regard must be based upon a sufficient record of competent evidence to sustain removal. *Id.* at 70 (citation omitted). The trial court's decision to discharge a juror will not be reversed absent a palpable abuse of discretion. *Commonwealth v. Treiber*, 874 A.2d 26, 31 (Pa. 2005).

Appellant's remaining challenges are to the sufficiency of the evidence sustaining his drug and firearm convictions. Specifically, Appellant argues that the Commonwealth failed to establish his intent to exercise control over the drugs and firearms in the book bag or his knowledge of the firearms in the book bag and inside 536 Fern Avenue. Appellant's Brief at 10.

> Our standard of review in a sufficiency of the evidence challenge is to determine if the Commonwealth established beyond a reasonable doubt each of the elements of the offense, considering all the evidence admitted at trial, and drawing all reasonable inferences therefrom in favor of the Commonwealth as the verdict-winner. The trier of fact bears the responsibility of assessing the credibility of the witnesses and weighing the

evidence presented. In doing so, the trier of fact is free to believe all, part, or none of the evidence.

*Commonwealth v. Newton*, 994 A.2d 1127, 1131 (Pa.Super.2010), *appeal denied*, 608 Pa. 630, 8 A.3d 898 (2010), quoting *Commonwealth v. Pruitt*, 597 Pa. 307, 318, 951 A.2d 307, 313 (2008) (citations omitted). The Commonwealth may sustain its burden by means of wholly circumstantial evidence, and we must evaluate the entire trial record and consider all evidence received against the defendant. *Commonwealth v. Markman*, 591 Pa. 249, 270, 916 A.2d 586, 598 (2007).

*Commonwealth v. Hopkins*, 67 A.3d 817, 820 (Pa. Super. 2013).

Appellant was not in physical possession of the contraband; therefore, the Commonwealth was required to establish that he had constructive possession of the seized items to support his convictions.

Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as conscious dominion. We subsequently defined conscious dominion as the power to control the contraband and the intent to exercise that control. To aid application, we have held that constructive possession may be established by the totality of the circumstances.

*Commonwealth v. Brown*, 48 A.3d 426, 430 (Pa.Super.2012), *appeal denied*, ––– Pa. ––––, 63 A.3d 1243 (2013) (internal quotation marks and citation omitted). Additionally, it is possible for two people to have joint constructive possession of an item of contraband. *Commonwealth v. Sanes*, 955 A.2d 369, 373 (Pa.Super.2008), *appeal denied*, 601 Pa. 696, 972 A.2d 521 (2009).

*Hopkins*, 67 A.3d at 820–821.

Upon review of the parties' briefs, the certified record, and the applicable law, we conclude that the trial court adequately and correctly disposed of Appellant's issues in its Pa.R.A.P. 1925(a) opinion. Therein, the trial court determined that excusing Juror Number One was not an abuse of its discretion and that the evidence was sufficient to sustain Appellant's convictions for possession of the drugs and firearms in the book bag and the firearms in the residence. Trial Court Opinion, 2/26/15, at 12, 18, 19, 25, 26. We find support in the record for the trial court's findings of fact and no error in its conclusions of law. Therefore, we affirm the judgment of sentence on the basis of the trial court's February 26, 2015 Rule 1925(a) opinion. The parties are directed to attach a copy of the trial court's opinion to this memorandum in the event of future proceedings.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/29/2016

- 7 -

COMMONWEALTH OF PENNSYLVANIA  :   IN THE COURT OF COMMON PLEAS

                                    :   BERKS COUNTY, PA

           v.                  :   CRIMINAL DIVISION

                                      :   NO. CP-06-CR-3738-13

KEVIN DOUGLAS MCGEE,          :

          Defendant             :   JUDGE THOMAS G. PARISI

Jay M. Nigrini, Esquire, Appeal Attorney for the Defendant
Alisa R. Hobart, Esquire, Appeal Attorney for the Commonwealth

MEMORANDUM OPINION, Thomas G. Parisi _TGP_           February 26, 2015

Appellant was charged with Possession with Intent to Deliver a Controlled Substance[1], Conspiracy to Commit Possession with Intent to Deliver a Controlled Substance[2], Possession of a Controlled Substance[3], Conspiracy to Commit Possession of a Controlled Substance[4], five counts of Persons not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms[5], and five counts of Conspiracy to Commit Persons not to Possess, Use, Manufacture, Control, Sell or Transfer Firearms[6]. On January 2, 2014, Appellant filed a Motion to Quash/Motion for Writ of Habeas Corpus. A hearing was held before this Court on January 9, 2014. Defense counsel and the Commonwealth were given sixty days to provide briefs in support of their arguments. On March 19, 2014, the Commonwealth filed "Proposed Findings of Fact and Conclusions of Law in Disposition of Appellant's Omnibus Pretrial Motion." On May 1, 2014, this Court denied Appellant's Motion to Quash/Motion for a Writ of Habeas Corpus.

A jury trial was held in this matter on August 26, August 27, and August 29 of 2014, which included two co-defendants. On August 29, 2014, the jury found Appellant guilty on: Count 1 — Possession with Intent to Deliver a Controlled Substance (cocaine); Count 2 —

---

[1] 35 P.S. § 780-113(a)(30).
[2] 18 Pa. C.S.A. § 903(a)(1); 35 P.S. § 780-113(a)(30).
[3] 35 P.S. § 780-113(a)(16).
[4] 18 Pa. C.S.A. § 903(a)(1); 35 P.S. § 780-113(a)(30).
[5] 18 Pa. C.S.A. § 6105(a)(1).
[6] 18 Pa. C.S.A. § 903(a)(1); 18 Pa. C.S.A. § 6105(a)(1).



Conspiracy to Commit Possession with Intent to Deliver a Controlled Substance (cocaine); Count 3 – Possession of a Controlled Substance (cocaine); Count 7 – Possession of a Controlled Substance (black molly); Count 9 – Persons not to Possess (Glock 21, .45 Caliber); Count 10 – Persons not to Possess (Bersa Thunder .380); Count 11 – Persons not to Possess (Springfield Armory XD M-40); Count 12 – Persons not to Possess (Colt 1911 Gold Cup National Match, .45 Caliber); and Count 13 – Persons not to Possess (Davis Industries, .38 Special). Appellant was found not guilty on: Count 4 – Conspiracy to Commit Possession of a Controlled Substance (cocaine); Count 5 – Possession with Intent to Deliver a Controlled Substance (black molly); Count 6 – Conspiracy to Commit Possession with Intent to Deliver a Controlled Substance (black molly); Count 8 – Conspiracy to Commit Possession of a Controlled Substance (black molly); and Count 14, Count 15, Count 16, Count 17, Count 18 – Conspiracy to Commit Persons not to Possess. Appellant was represented at his pretrial hearing and jury trial by Attorney Samuel C. Stretton, Esquire.

On September 8, 2014, Attorney Stretton filed a Motion to Withdraw after the Sentencing Hearing scheduled for October 9, 2014. On October 9, 2014, the Sentencing Hearing was continued to November 24, 2014 due to scheduling conflicts.

On November 24, 2014, this Court imposed a sentence on Count 1 for a period of not less than five (5) years nor more than ten (10) years imprisonment, with 488 days time served and a fine in the amount of $1,000. On Count 2, Appellant was sentenced for a period of not less than five (5) years nor more than ten (10) years imprisonment, which shall commence at the expiration of the sentence imposed in Count 1. On Count 7, Appellant was sentenced to a probation period of ten (10) years, which shall commence at the expiration of the sentence imposed in Count 2 and will run concurrent with Counts 9, 10, and 11. On Counts 9, 10, and 11,

2.

Appellant was sentenced to a probation period of ten (10) years, which shall commence at the expiration of the sentence imposed in Count 2. No further punishment was imposed for Counts 12 and 13. Additionally, Attorney Stretton was granted his request to withdraw from representation of Appellant.

On December 15, 2014, Jay M. Nigrini, Esquire was appointed as Conflict Counsel to represent Appellant due to an existing conflict of interest with the originally appointed Public Defender's Office. Conflict Counsel was given an extension of time, until January 9, 2015, to file a Notice of Appeal with the Superior Court. On January 9, 2015, this Court received Appellant's Notice of Appeal with the Superior Court of Pennsylvania. On February 10, 2015, Appellant filed his Concise Statement of Errors Complained of on Appeal. Appellant raises the following issues on appeal:

1. Whether the trial court erred in excusing *sua sponte* Juror #1 prior to deliberations over the objection of counsel and without good cause?

2. Whether there was sufficient evidence to support the jury's verdict as to all of the charges as the Commonwealth failed to establish Appellant's intent to exercise control over the drugs and guns found inside the black book bag located inside the black Cadillac Escalade?

3. Whether there was sufficient evidence to support the jury's verdict as to all the charges as the Commonwealth failed to establish Appellant's knowledge that he was aware there were drugs and guns inside the black book bag located inside the black Cadillac Escalade?

4. Whether there was sufficient evidence to support the jury's verdict as to the gun charges pertaining to firearms located inside 536 Fern Avenue as the Commonwealth failed to establish Appellant's intent to exercise control over the firearms?

5. Whether there was sufficient evidence to support the jury's verdict as to the gun charges pertaining to firearms located inside 536 Fern Avenue as the Commonwealth failed to establish Appellant's knowledge he was aware that there were firearms located inside the residence?

Appellant's Concise Statement of Errors, 2/10/15.

3

## FACTUAL FINDINGS

On February 21, 2013, Reading Police Officers were detailed to the Queen City Diner located at 100 Lancaster Avenue, Reading, Pennsylvania in response to a shooting. Upon arrival, Officer Chris Dinger spoke to an employee of the restaurant who identified the shooting victim as a "black male with dreads." The employee observed the victim suffering from a gunshot wound. The employee went on to say that the victim had left the restaurant prior to Officer Dinger's arrival. Officer Dinger then checked the area outside of the Queen City Diner to search for the individual who matched the description given by the employee of the restaurant.

During the search, Officer Dinger received a radio dispatch that an individual matching the shooting victim description had just been dropped off at Reading Hospital for treatment of a gunshot wound. Once officers arrived at Reading Hospital, they approached the victim and requested his identification and address. The victim identified himself as Appellant. Appellant then provided officers with information that he had been shot near 10th and Elm Street, near Tophers Bar in Berks County, Pennsylvania. When asked additional follow-up questions about the shooting, Appellant said he was drunk and did not remember what happened.

Hospital staff informed police that Appellant had been dropped off at the hospital by a white SUV with large chrome rims. Officers were able to verify Appellant's address as 536 Fern Avenue. After confirming Appellant's address at City Hall, multiple Reading Police Officers traveled to 536 Fern Avenue.

C.I. Perkins returned to the Queen City Diner with prepared photographic lineups for witness identification of the male shooting victim seen at the restaurant. An employee identified the shooting victim seen in the restaurant as Appellant from the pictures presented.

4

## I. Search of the Black Cadillac Escalade

Upon arriving at 536 Fern Avenue, Officer Dinger checked the area around the house in search of a white SUV, which he eventually found in an alley located behind 536 Fern Avenue. Officer Dinger observed a stain, which he believed to be fresh blood, on the center console of the white SUV. Officer Dinger then noticed a black Cadillac Escalade parked across the alley in the open garage of the residence. Officer Dinger then proceeded to walk towards the black Cadillac and shined his flashlight into the vehicle to continue his investigation. Upon approach, Officer Dinger confirmed the black Cadillac Escalade had a flat tire and bullet holes located in the driver's side of the vehicle.

Officer Dinger continued to circle the vehicle to make sure there were no injured persons inside the car as a result of the bullet holes. Additionally, as Officer Dinger circled the vehicle, he noticed a black bag in the front seat, but did not see any blood inside the vehicle. Neither guns nor contraband were directly observed by Officer Dinger at this time. Officer Dinger advised other officers of his observations, and it was determined that the vehicles would be seized pending search warrant applications based on his observations.

It was later confirmed that the white SUV, was registered to co-defendant, Vanessa Moore, and the black Cadillac Escalade, was registered to Moore's mother, Rosalie Moore. The white SUV and black Cadillac Escalade were not registered to Appellant. Search warrants were then obtained for both vehicles.

Criminal Investigator (C.I.) Snell testified that he assisted in the execution of the search warrant for the black Cadillac in the garage, and that he removed the black book bag found on the floor of the front passenger-side area. Upon opening the black book bag, C.I. Snell observed a large white dinner plate inside a clear Ziploc bag. On the plate was a substance that appeared to

5

C.I. Snell to be crack cocaine. At that point, C.I. Snell placed the backpack back on the floor of the car and advised the Vice division of the situation. Lieutenant Parr advised C.I. Snell to tow the vehicle to Vince's Towing so that a search warrant could be obtained relating to a drug investigation. Prior to the transport of the vehicle, officers processed the black Cadillac Escalade for ballistic evidence, as evidence technicians were concerned about its possible movement or destruction during transport.

Once a secondary search warrant was obtained for the black book bag inside the black Cadillac Escalade, officers executed the search warrant. The following items were seized from inside the black book bag:

- A quantity of cocaine and crack cocaine

- Four handguns

- A scale, spoons, plates, razor blades

- Pills, identified as Black Mollies

- Empty baggies

Criminal Investigator ("C.I.") Haser, of the Vice unit, testified that numerous fingerprints were identified inside the black book bag, but were only identifiable to co-defendant, Ms. Erica Henderson. Neither Appellant nor Ms. Henderson is licensed to carry concealed weapons, and Appellant has a prior felony, rendering him ineligible to possess any firearm. It was confirmed by C.I. Haser that no contraband was found inside the vehicle's center console.

Among the things seized from within the black Cadillac Escalade were documents addressed to Appellant at 536 Fern Avenue, Reading, Pa.

6

No paperwork or documents belonging to co-defendant Vanessa Moore or co-defendant Erica Henderson were found in the black Cadillac Escalade.

**II. Search of 536 Fern Avenue**

C.I. Perkins testified that relative to his initial shooting investigation at Reading Hospital, the officers determined that 536 Fern Avenue was a residence of interest and likely to be where Appellant lived. Officers traveled to the residence to further investigate the original shooting investigation that began at the Queen City Diner. Co-defendant Moore, told C.I. Perkins that 536 Fern Avenue was her home address. Moore was then asked by C.I. Perkins whether Appellant resided at the residence. Moore told C.I. Perkins that Appellant did not live at the residence, but rather he was a friend who came by and spent time at the residence. Moore denied knowledge of or claim to the black Cadillac Escalade, reiterating that the vehicle was in fact her mother's car. Moore did confirm to officers that the white SUV (Lincoln Navigator) was her vehicle.

C.I. Perkins indicated that during the investigation co-defendant Erica Henderson was present inside the home along with her two small children. There was also a third female present, Veronica Ortega. Ortega, Henderson and her two children were allowed to leave the scene.

Officers were at 536 Fern Avenue when Appellant returned to the residence. Appellant was then advised that the house was being secured pending a search warrant and Appellant proceeded to leave the house.

A comprehensive search of the residence was completed once a search warrant was obtained for 536 Fern Avenue. In the kitchen and living room areas, C.I. Perkins found a Bersa gun box and Bersa handgun registered to and provided to officers by Moore. A metal safe was also found in the kitchen pantry.

7

Inside the basement refrigerator on the top shelf, there was a powder like substance, a magazine from a firearm, ammunition, and a shoulder holster. Plastic bins were also found in the basement with one label reading, Kevin's shoes, and the other label reading, Ruby's clothes. It was confirmed at the preliminary hearing that "Ruby" is a known nickname for Ms. Moore. A wallet was discovered in the basement area holding a Pennsylvania identification card for Appellant. The address on Appellant's Pennsylvania identification card was listed as 536 Fern Avenue and issued on July 5, 2012.

C.I. Snell went to the second floor in the front bedroom and indicated that there was a photograph of Appellant on the nightstand table by the bed in the second floor bedroom. Snell opened the drawers of the nightstand and discovered a live, 45-caliber round and several pairs of black men's socks. There was also a safe in the bedroom which contained a watch, several small pills, and some jewelry. In the shower stall on the second floor, men's and women's hygiene products were also found. On the first floor of the residence, officers found pieces of mail addressed to Appellant at 536 Fern Avenue.

## DISCUSSION

### I. Trial Court Error

The first claim raised by Appellant is that the trial court erred in excusing *sua sponte* Juror #1 prior to deliberations over the objection of counsel and without good cause.

The discharge of a juror is within the sound discretion of the trial court. Absent a palpable abuse of that discretion, the court's determination will not be reversed. *Commonwealth v. Black*, 376 A.2d 627, 632 (1977). The discretion exists even after the jury has been impaneled and the juror sworn. *Commonwealth v. Saxton*, 353 A.2d 434 (1976).

8

In this matter, the trial judge dismissed Juror #1 after she informed the court on August 27, 2014 that she could not stay past 6:00 p.m. The Court asked the following:

THE COURT: Counsel, I have been informed that we have a juror who has a time restriction this evening. In fact, I believe from what I was told, wants to or needs to leave now. Is that correct, ma'am?

JUROR #1: Yes.

THE COURT: And the problem that you have is what?

JUROR #1: I am the only one that can watch my granddaughter who was very sick when she was born, and I am the only one who can take her. And my daughter has to be at school.

THE COURT: Does counsel have any questions of this juror?

MS. BELLINO: No.

THE COURT: I intend to excuse her as a juror. Any objections?

COMMONWEALTH: No, Your Honor.

MS. BELLINO: My questions is whether or not she is being excused as a juror for the entirety of the trial.

THE COURT: Yes, she will be excused and an alternate will take her place.

MS. BELLINO: Okay. I mean,, I can either place an objection on sidebar—

THE COURT: No. You can place an objection. Do you have an objection?

MS. BELLINO: I do have an objection.

THE COURT: Okay. Objection is noted.

MS. BELLINO: That's not the extent of my objection.

THE COURT: I will let you put it on the record later. Ma'am, you are excused . . .

9

. . .

| | |
|---|---|
| THE COURT: | Now, Ms. Bellino? |
| MS. BELLINO: | Yes, Your Honor. |
| MR. STRETTON: | Your Honor, I join in the objection with some other aspects to it. |
| MS. BELLINO: | Your Honor, my understanding from that brief interaction was that this woman, Juror Number 1, could not remain after 6:00 p.m. this evening. I did not hear that she would not be able to return on Friday which is when they were supposed to reconvene in this trial or any subsequent date. We took quite some time to pick this jury of 12. |
| | And if the choice was to be excused for the day and return on Friday to begin again with the trial, then that would have been my preference rather than have an alternate. Because as I said, we took much time to pick these 12 jurors. That's my objection. |
| THE COURT: | Mr. Stretton? |
| MR. STRETTON: | Recognizing judicial economy and we all want to get this case done, I'm not adverse to that but I do object to letting her go. Mr. McGee feels strongly on that. And it is 6:00 at night, and we have been going since 9:00 this morning . . . |
| | And it's awfully late, and it is difficult to concentrate. It is an important witness . . . So I object on two bases. One is it's getting awful late. I'm tired. And two, I don't think we should have excused her for that reason. But my objection is noted. |
| THE COURT: | Okay. The objections are noted. And she is still excused *sua sponte* by the Court based upon the court's schedule and the delays that we have had in this trial up to this point and the calendar including the upcoming holiday weekend. We are going to recess for 15 minutes, and then we will continue. |

Notes of Testimony [hereinafter "N.T."], 8/27/14, at 336-39

After this recess, the three defense attorneys started and finished their cross-examination of C.I. Michael Perkins. N.T., 8/27/14, at 339-382. The jury trial adjourned at 7:35 p.m. that evening. *Id.* at 382. In the Court's initial instructions to the jury prior to opening statements, the trial court provided the jury with the following information:

> THE COURT:  Usually – and nothing has gone as usual in this case so far as far as time. But usually that means we go to at least 4:00 in the afternoon. We have accomplished that today. And we usually try to break by 5:00. And we are going to do that today.
>
> I am not going to guarantee that we will do that tomorrow because I certainly want to get this case finished by Friday. I recognize that it is a holiday weekend. So and unfortunately Thursday there is already a full schedule that I have to deal with. So I won't be able to continue with the trial on Thursday. So we will be breaking by 5:00 today.
>
> We may go a little later than that tomorrow. You will also get a break in the middle of the morning and the middle of the afternoon. That typically is going to be about 10 minutes or so. And that's just a chance for you as jurors to refresh yourself if your attention span has started to drop a little bit as psychologists tell us that it does after about an hour, hour and a half.

N.T., 8/26/14, at 49.

The trial court informed the jury that it "usually" adjourned at 5:00 p.m. in the evening. Additionally, the jury was allowed to leave the courtroom at 4:58 p.m. on the first day of trial. N.T., 8/26/14, at 56.

After review of the record, it is apparent that Juror #1 properly informed the trial court of the issue she faced at home if she was forced to stay past 6:00 p.m. on the second day of trial. The trial court excused the juror and the juror's place was taken by the first alternate juror. The contention that the trial court committed reversible error is unfounded since Juror #1 was

11

excused due to a long standing commitment to take care of her sick granddaughter and she evidently did not expect the trial to last as long as it did that second evening. Furthermore, the trial court recognized its intention to finish the jury trial before the three-day holiday weekend so as to avoid juror confusion and/or forgetfulness. The jury trial consisted of three co-defendants who were each charged with various offenses. The trial court believed the jury was more likely to give their full attention to the complicated evidence if the trial completed prior to the eventual three-day holiday break. Due to the scheduling obstacles and Juror #1's family predicament, there was nothing improper in the court's handling of this matter. The court did not abuse its discretion when it excused Juror #1 for these reasons. *See e.g., Commonwealth v. Jerry*, 485 Pa. 95, 401 A.2d 310 (1979).

## II. Sufficiency of the Evidence

Appellant's next claim is that there was insufficient evidence to support the jury's verdict as to all of the charges as the Commonwealth failed to establish Appellant's *intent to exercise control* over the drugs and guns found inside the black book bag located inside the black Escalade.

The standard of review of a sufficiency of the evidence challenge is as follows:

> In reviewing a challenge to the sufficiency of the evidence, we must determine whether, viewing all the evidence admitted at trial, together with all reasonable inferences therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offense charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt.

*Commonwealth v. Jones*, 636 A.2d 1184, 1189 (Pa. Super. 1994). The reviewing court must determine whether the evidence was sufficient to have permitted the trier of fact to find that each and every element of the crimes charged was established beyond a reasonable doubt. *Commonwealth v. Davidson*, 860 A.2d 575, 580 (Pa. Super. 2004).

12

The facts established by the Commonwealth need not be absolutely incompatible with the defendant's innocence so long as the evidence against the defendant is not "so weak and inconclusive that as a matter of law no probability of fact can be drawn from the circumstances." *Id.* The Commonwealth may meet its burden by means of wholly circumstantial evidence. *Commonwealth v. Craybill*, 926 A.2d 488, 490 (Pa. Super. 2007).

i.    **Appellant's Intent to Exercise Control Over the Drugs and Guns Found Inside the Black Book Bag**

In this matter, Appellant claims that the Commonwealth failed to prove Appellant's intent to exercise control over the drugs found inside the black book bag. The following items were seized by C.I. Haser from the black book bag inside the black Cadillac Escalade:

- Multiple baggies of crack cocaine and powder cocaine

- Four handguns

    o Springfield Armory, XD M-40

    o Colt 1911, .45 caliber pistol

    o Glock 21, .45 Caliber

    o Davis Industries, .38 Special

- A scale, spoons, plates, razor blades

- Pills, identified as Black Molly

- Empty baggies

- Ammunition

N.T., 8/27/14, at 433-450; Commonwealth's Exhibit No. 43.

Possession of contraband can be proven by showing actual possession, i.e., contraband found on the appellant's person, or by showing that the appellant

13.

constructively possessed the contraband. *Macolino*, 469 A. 2d at 132. Since the drugs and guns were found in the black Cadillac Escalade, and not on Appellant's person, the Commonwealth had the burden of proving that he had constructive possession of the drugs and guns. Constructive possession has been defined as the ability to exercise a conscious dominion over an illegal substance: the power to control the contraband and the intent to exercise that control. *Commonwealth v. Chenet*, 373 A.2d 1107, 1108 (Pa. 1977); *Commonwealth v. Fortune*, 318 A.2d 327, 328 (Pa. 1974); *Commonwealth v. Sterling*, 361 A.2d 799, 804 (Pa. Super. 1976).

Intent to maintain a conscious dominion may be inferred from the totality of the circumstances. *Fortune*, 318 A.2d at 329. Further, circumstantial evidence may be used to establish a defendant's possession of contraband. *Commonwealth v. Bentley*, 419 A.2d 85, 87 (Pa. Super. 1980). The fact that another person may also have control of and access to drugs and/or guns, however, does not eliminate the defendant's constructive possession. *Commonwealth v. Haskins*, 677 A.2d 328 (Pa. Super. 1996). Two actors may have joint control and equal access and thus both may constructively possess the contraband. *Commonwealth v. Jones*, 874 A.2d 108 (Pa. Super. 2005); *Haskins*, 677 A.2d at 328. In order to prove joint constructive possession, the Commonwealth has to prove; 1) the power to control and, 2) the intent to exercise joint control on the part of the Appellant. *See Commonwealth v. Samuels*, 340 A.2d 880 (Pa. Super. 1975). These elements can be inferred from the totality of the circumstances; even mere presence is a factor. *Commonwealth v. Cash*, 367 A.2d 726 (Pa. Super. 1976).

Concerning the contraband found inside the black book bag on the floor of the black Cadillac Escalade, Appellant argues that the Commonwealth did not provide

14

sufficient evidence to demonstrate that he constructively possessed the drugs and guns. As stated above, constructive possession requires proof of the ability to exercise conscious dominion over the illegal contraband, the power to control the contraband, and the intent to exercise such control. *Commonwealth v. Bricker*, 882 A.2d 1008, 1016 (Pa. Super. 2005). When more than one person has access to the location of the contraband, the Commonwealth must provide evidence demonstrating either Appellant's participation in the contraband-related activity or evidence connecting Appellant to the location where the contraband was found. *Commonwealth v. Rippy*, 732 A.2d 12,14, 1220 (Pa. Super. 1999).

In this matter, Myriam Saint-Preux testified at trial that at around 2:40 a.m. on February 21, 2013, she heard gunshots outside her residence. Notes of Testimony [hereinafter "N.T."], 8/27/14, at 100-01. Saint-Preux looked outside the window of her residence and observed a man with long dreads running towards a black vehicle parked on Morgantown Road. *Id.* at 101-02. The man with the dreads proceeded to get inside the car and drive off. *Id.* at 101-02. Saint-Preux confirmed at the trial that the Queen City Diner is located "right next" to her residence. *Id.* at 102. On March 6th, C.I. Perkins brought Saint-Preux down to the police precinct for investigative purposes. In the statement, which occurred about two weeks after the shooting, Saint-Preux was shown a picture of the Cadillac that was involved in the incident. Saint-Preux immediately told C.I. Perkins that she observed a black SUV in the front of her house at 2:40 a.m. on February 21, 2013. N.T., 8/2714, at 124-16; Appellant's Exhibit No. 3, at 42.

Donna Seiders testified at trial that a black or dark Spanish man entered the Queen City Diner at roughly 2:40 in the morning on February 21, 2013. N.T., 8/27/14, at

15

88. Seiders confirmed that she believed the man who entered the Diner had dreads, but she was not sure. *Id.* She then testified that man attempted to enter the kitchen of the Diner and as he did, she told him that he "could not go in there." *Id.* at 89. In response, the man informed her that he had been shot. *Id.* Seiders then proceeded to call the police. *Id.*

Atef Zeiada, an employee at the Queen City Diner, was also working the night shift on February 21, 2013 and witnessed a black male enter the Queen City Diner at around 2:40 a.m.. The defense stipulated at trial that when Zeiada was shown a photo array by Reading Police, Zeiada identified Appellant as the man that came into the kitchen and told the employees that he had been shot on February 21, 2013. N.T., 8/27/14, at 96-98; Defense Exhibit No. 3, at 46-47.

Officer Christopher Dinger testified at trial that around 2:40 a.m. on February 21, 2013, he received a dispatch notifying him that a shooting victim had entered the Queen City Diner. N.T., 8/27/14, at 132-33. Officer Dinger proceeded to the Diner and employees notified the officer that the man who had been shot left upon the Officer Dinger's arrival. *Id.* at 133. Eventually, Officer Dinger received another radio dispatch that an individual matching the description of the man who entered the Queen City Diner had just checked into Reading Hospital. *Id.* at 134. Officer Dinger then drove to Reading Hospital and was able to identify the man as Appellant. Appellant was asked his address at the Hospital and Appellant stated his address was 536 Fern Avenue. N.T., 8/27/14, at 137. Officer Dinger then relayed that information to Reading Police that the shooting victim (Appellant) lived at 536 Fern Avenue. N.T., 8/27/14, at 138. Officer Dinger then

16

received further information that the shooting victim (Appellant) was dropped off at Reading Hospital by a white SUV. *Id.* at 138.

Once at 536 Fern Avenue, Officer Dinger observed a black Cadillac Escalade parked inside the open garage. N.T., 8/27/14, at 141. From looking inside the garage from the outside, Officer Dinger observed a bullet hole in the driver's side front door and the front driver's side tire was flat. N.T., 8/27/14, at 142. Officer Dinger testified that upon closer examination he realized the whole driver's side front of the black Cadillac Escalade was riddled with bullet holes. N.T., 8/27/14, at 143.

Once the black Cadillac Escalade was seized and taken to Vince's towing pursuant to the criminal investigation, C.I. Kevin Haser performed the search of the black book bag found inside the vehicle and the vehicle itself. N.T., 8/27/14, at 431-432. C.I. Haser discovered the following items in the center console of the vehicle identifying Appellant:

1. A dental appointment reminder with Appellant's name.

2. An AARP prepaid mastercard with Appellant's name and address listed as 536 Fern Avenue.

N.T., 8/27/14, at 432.

No paperwork or documents belonging to co-defendant Vanessa Moore or co-defendant Erica Henderson were found inside the black Cadillac Escalade. C.I. Haser confirmed that most of the ammunition that was found in a basement refrigerator of 536 Fern Avenue could be loaded in the guns found inside the black book bag. N.T., 8/27/14, at 451.

The evidence presented at trial was sufficient to support Appellant's intent to exercise control over the contraband seized inside the black book bag on February 21, 2013. First, Appellant, suffering from a gunshot wound, admitted at the Hospital that he resided at 536 Fern Avenue, where the vehicle was found parked inside the residence's open garage. Second,

17

documents addressed to Appellant at 536 Fern Avenue were found inside the black Cadillac Escalade, while no documentation was found inside the vehicle addressed to either co-defendant. Additionally, on the night of the incident, Myriam Saint-Preux testified that after hearing gunshots outside her home, she observed a black male with dreads, matching the description of Appellant, running towards a black SUV. It was also confirmed at trial that Appellant entered the Queen City Diner directly following the sound of gunshots and was observed by various employees to have entered the Diner with a gunshot wound. Finally, Officer Dinger observed multiple bullet holes in the driver's side front of the black Cadillac Escalade on the night in question.

This circumstantial evidence connecting Appellant to the black Cadillac Escalade on the night of the incident was sufficient to prove the Appellant's intent to exercise control over the drugs and guns found inside the black book bag. Intent to maintain a conscious dominion, moreover, may be inferred from the totality of circumstances, and from circumstantial evidence. *Commonwealth v. Valette*, 613 A.2d 548, 550 (Pa. 1992). Although co-defendant Erica Henderson's fingerprints were found on items inside the black book bag, the Commonwealth was not bound to prove that Appellant exerted more control over the book bag than his two co-defendants, but rather, that he exerted joint control, and had equal access both to the book bag and the contraband. *See Commonwealth v. Chenet*, 352 A.2d 502 (Pa. Super. 1975). This circumstantial evidence was sufficient to prove joint constructive possession on behalf of Appellant.

18

### ii. Appellant's Knowledge of Drugs and Guns Found Inside the Black Book Bag

Based on the foregoing evidence reference above, it was reasonable for the fact-finder to conclude that Appellant had knowing dominion over the drugs and guns found inside the black book bag inside the vehicle.

"An accused may be charged with the knowledge of the location of the contraband, which is essential to the proof of an intent to exercise control, if the contraband is found in places peculiarly within the control of the accused." *Commonwealth v. DeCampli*, 364 A.2d 456-57 (Pa. Super. 1976).

Looking at the evidence presented at trial, the jury could conclude that Appellant was in control of the vehicle on the night of February 21, 2013. Myriam Saint-Preux testified that after hearing gunshots outside her home, she observed a black male with dreads, matching the description of Appellant, running towards a black SUV. Later that evening, Appellant arrived at the Hospital suffering from gunshot wounds. After leaving the hospital, Officer Dinger discovered the black Cadillac Escalade at 536 Fern Avenue with bullet holes on the driver's side of the vehicle. Appellant admitted at the Hospital to residing at 536 Fern Avenue where the vehicle and book bag were discovered. C.I. Haser confirmed that most of the ammunition that was found in the basement refrigerator of 536 Fern Avenue could be loaded in the guns found inside the black book bag. N.T., 8/27/14, at 451. Additionally, only Appellant's personal documents were found inside the vehicle along with the book bag. The circumstances Appellant found himself in on the night of the shooting, justify an inference that Appellant had both the knowledge to control and the intent to exercise that control over the drugs and guns.

19

### iii. Appellant's Intent to Exercise Control Over the Firearms Inside 536 Fern Avenue

In order to obtain a conviction under 18 Pa.C.S. § 6105, the Commonwealth must prove beyond a reasonable doubt that the defendant possessed a firearm and that he was convicted of an enumerated offense that prohibits him from possessing, using, controlling, or transferring a firearm. *Commonwealth v. Thomas*, 988 A.2d 669, 670 (Pa. Super. 2009). The term "firearm" is defined in that section as any weapon that is "designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of any such weapon." 18 Pa.C.S. § 6105(i). Illegal possession of a firearm may be shown by constructive possession. *Commonwealth v. Parker*, 847 A.2d 745, 750 (Pa.Super.2004). To obtain a conviction under a constructive possession theory, the Commonwealth is required to establish both defendant's power of control over the weapon and his intention to exercise that control. *Id.* Constructive possession may be inferred from the totality of the circumstances. *Commonwealth v. DeCampli*, 364 A.2d 454 (Pa. Super. 1976).

The fact that another person may also have control of and access to drugs and/or guns, however, does not eliminate the defendant's constructive possession. *Commonwealth v. Haskins*, 677 A.2d 328 (Pa. Super. 1996). Two actors may have joint control and equal access and thus both may constructively possess the contraband. *Commonwealth v. Jones*, 874 A.2d 108 (Pa. Super. 2005); *Haskins*, 677 A.2d at 328. In order to prove joint constructive possession, the Commonwealth has to prove; 1) the power to control and, 2) the intent to exercise joint control on the part of the Appellant. *See Commonwealth v. Samuels*, 340 A.2d 880 (Pa. Super. 1975). These elements can be

20

inferred from the totality of the circumstances; even mere presence is a factor. *Commonwealth v. Cash*, 367 A.2d 726 (Pa. Super. 1976).

At trial, Defense stipulated that on January 6, 1997, Appellant had a prior conviction of robbery in the first degree, and as a result Appellant was prohibited from possessing a firearm. N.T., 8/27/14, at 634.

Officer Kyle Kunkle testified to the discovery of the firearm found inside 536 Fern Avenue. N.T., 8/27/14, at 176-77. While securing the residence prior to obtaining the search warrant, Officer Kunkle checked the sofa in the living room for weapons and located a loaded, black and silver .380 Bersa sitting on the sofa. *Id.* at 177; Commonwealth's Ex. No. 7. Co-defendant Vanessa Moore pointed to the pistol in the living room and told Officer Kunkle that she had a permit for the weapon. N.T., 8/27/14, at 180-81, 185. The weapon was then placed on the kitchen table of the residence until the shooting investigation was completed. *Id.* at 178.

Officer Gary Dickson assisted in the initial investigation of 536 Fern Avenue along with Officer Kunkle. N.T., 8/27/14, at 193. Officer Dickson testified that at 7:14 a.m., Appellant showed up at 536 Fern Avenue while he and Officer Kunkle were waiting for the search warrant to be issued. *Id.* at 194, 208. Appellant entered through the rear entrance of the residence and into the kitchen. *Id.* at 195. Officer Dickson met Appellant in the kitchen and observed Appellant acting agitated and yelling. At this time, Officer Dickson observed the .380 Bersa handgun sitting on the kitchen table in close proximity to Appellant upon his entry to the residence. *Id.* at 195-96. For safety purposes, Officer Dickson took control of the Bersa handgun because of Appellant's open hostility towards the police being present in the residence. *Id.* at 196. Officer Dickson testified that

21

Appellant was yelling, "Why did you let them in, they can't be in here, they can't be in, they can't be in my house." *Id.* at 197. Officer Dickson confirmed that eventually Appellant left the residence, taking a pair of flip flops with him from the residence. *Id.* at 203-205.

C.I. Snell assisted in the execution of the search warrant for 536 Fern Avenue. N.T., 8/27/14, at 285. Upon entering the residence, he was assigned to search the second floor front bedroom of the residence. *Id.* C.I. Snell observed a photo of Appellant on the night stand next to the bed in the second floor bedroom. *Id.* The top drawer of that same night stand held one live .45 caliber round. *Id.* The bottom drawer of the night stand held numerous pairs of men's black socks. *Id.* Underneath the side of the bed was a silver gun case containing a loaded 12 gauge shotgun and a pair of Smith & Wesson handcuffs. N.T., 8/27/14, at 286. In the bathroom on the second floor, men's bodywash was found on the shelf inside the shower. *Id.* at 426-427.

C.I. Perkins was also assigned to assist in the search 536 Fern Avenue. *Id.* at 314-15. While searching the kitchen area of the residence he discovered there was a small closet pantry area full of several items, including a box for a Bersa handgun. *Id.* at 315. C.I. Perkins located a Pennsylvania Identification Card issued to Appellant on July 5, 2012 inside a wallet in the basement. *Id.* at 344-345. The address listed on Appellant's Pennsylvania Identification Card was 536 Fern Avenue. N.T., 8/27/14, at 317. C.I. Perkins also located a box of American Eagle .380 Auto American Eagle cartridges, a bag of Magtech Centerfire cartridges, and some loose rounds in a bag inside the basement refrigerator. *Id.* at 342-344. A shoulder holster, a Crimson Trace user manual for laser sight Owners handbook, a box of .380 Hornady ammunition, two keys, and a box of 40

22

S&W 150 grain ammunition were found in the basement as well. *Id.* at 343-344. C.I. Haser confirmed that most of the ammunition that was found in the basement refrigerator of 536 Fern Avenue could be loaded in the guns found inside the black book bag. N.T., 8/27/14, at 451.

C.I. Haser of the Vice Unit also assisted in the search of 536 Fern Avenue. *Id.* at 424-425. C.I. Haser discovered items of mail addressed to Appellant in the living room of the residence. *Id.* at 425-426; Commonwealth's Ex. No. 38, 39. A letter from Wal-Mart concerning a reloadable prepaid money card was discovered and addressed to Appellant at 536 Fern Avenue. N.T., 8/27/14, at 426. A bill from AT&T was also discovered in the living room, addressed to Appellant at 536 Fern Avenue. *Id.* C.I.Haser confirmed that he identified plastic tote bins containing clothing in the basement of the residence. *Id.* at 457-58. One of the tote bins was labeled Kevin's shoes and the other tote was labeled Ruby's clothing. *Id.* at 457-58; Defense Ex. No. 7. C.I. Haser confirmed at the trial that Ruby was a nickname used by Vanessa Moore. *Id.* at 458.

In this matter, the Commonwealth provided sufficient evidence to enable the trier of fact to find every element of the crime of persons not to possess beyond a reasonable doubt. "The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to, believe all, part, or none of the evidence presented." *Commonwealth v. Brown*, 52 A.3d 320, 323 (Pa. Super. 2012).

In the instant case, the Commonwealth displayed a multitude of evidence showing that Appellant resided at 536 Fern Avenue. Defendant was asked his address at the Hospital and he confirmed his address as 536 Fern Avenue. A wallet was found inside the residence containing a Pennsylvania Identification Card for Appellant. The address listed

23

on Appellant's Pennsylvania Identification Card was 536 Fern Avenue. Furthermore, a picture of Appellant and pairs of men's socks were found in the second floor bedroom. Men's bodywash was also found in the shower of the second floor of the residence. A box of shoes with Appellant's name was found in the basement. Mail addressed to Appellant at 536 Fern Avenue was found in the living room of the residence as well. This correspondence represented bank mail and a phone bill. This type of correspondence is circumstantial evidence tending to show that Appellant resided at 536 Fern Avenue and was more than a mere guest of the residence. Appellant also returned to the residence immediately after his hospital visit, entering through the rear entrance. Appellant displayed outward hostility towards the police as he questioned their presence inside the residence. Upon Appellants entry to the residence, the firearm sat in plain view on the kitchen table and in close proximity to Appellant.

The .380 Bersa handgun in question was found on the sofa in the living room and the gunbox for the firearm was found inside the kitchen pantry of the residence. In this case, the Commonwealth established that Appellant resided in the residence and based on circumstantial evidence, he most likely slept in the second floor bedroom. The Pennsylvania Superior Court indicated in *Commonwealth v. Gilchrist*, 386 A.2d 603 (Pa. Super. 1978) that a bedroom is a more private place with limited access and usually subject to the exclusive control of the owner or lessee of the premises. *Gilchrist*, 386 A.2d at 605. It is apparent that Appellant had easy access to the firearm as a resident of 536 Fern Avenue as the firearm was found in the sofa of the residence's main living area. The Commonwealth was not bound to prove that Appellant exerted more control over the premises than his co-defendants, but rather, that he exerted joint control, and had equal

access both to the living area and the firearm. *See Commonwealth v. Chenet*, 352 A.2d 502 (Pa. Super. 1975). The circumstantial evidence presented by the Commonwealth connecting Appellant to the residence was sufficient to prove joint constructive possession of .380 Bersa discovered in the living room sofa.

### iv. Appellant's Knowledge of the Firearms Inside 536 Fern Avenue

Appellant's final claim is that the Commonwealth failed to establish Appellant's knowledge that he was aware of the firearms located inside the residence.

In this case, the fact-finder, examining all of the evidence in its totality, could reasonably conclude that Appellant was aware of the firearm located in a commonly used area of the residence. The presence of: (1) Appellant's clothing and picture in the second floor bedroom; (2) Appellant's box of shoes and wallet in the basement; and (3) Appellant's personal mail in the living room, indicate that Appellant had access to the entire residence, including the living room where the Bersa handgun was found. Appellant's entry of the rear entrance in the morning also provides insight into his knowledge and attachment with the residence.

The Bersa handgun was found in the sofa located in the main living area of the residence. Additionally, the gunbox for the Bersa handgun was found inside the kitchen pantry of the residence. The handgun and gunbox were found in places that a resident of 536 Fern Avenue would likely access on a consistent basis. Although co-defendant Vanessa Moore admitted to living at the residence and owning the firearm, constructive possession can be found in one defendant when two residents have equal access to an area where contraband is found. *Commonwealth v. Macolino*, 469 A.2d 132, 207-208 (Pa. Super. 1983). It is no defense that co-defendant Moore admitted to owning the Bersa

handgun. Possession need not be exclusive; two or more can possess the contraband at the same time. *See Commonwealth v. Griffin*, 326 A.2d 554 (Pa. Super. 1974). Looking at the totality of the circumstances, Appellant's personal items found throughout the residence connect Appellant to the firearm in the living room. These personal items show that as a resident, Appellant accessed the living room and kitchen, meaning he likely had knowledge of the handgun. Based on the foregoing evidence, it was reasonable for the fact-finder to conclude that Appellant maintained a conscious dominion over the firearm found in the living room which he shared with co-defendant Moore.

Therefore, this Court respectfully requests that the Appellant's appeal be denied.